## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LAURA AGARD and ROSHANNA RICHARDSON,<br><br>        Plaintiffs,<br><br>  v.<br><br>JPMORGAN CHASE & CO. & JP MORGAN SECURITIES LLC,<br><br>        Defendants. | Case No.:<br><br>**Jury Trial Demanded** |

## COMPLAINT

Plaintiffs, Laura Agard ("Agard") and Roshanna Richardson, ("Richardson") (collectively, "Plaintiffs"), by and through their attorneys, Stowell & Friedman, Ltd., file this Complaint against Defendants JPMorgan Chase & Co. and JPMorgan Securities LLC, (collectively "Chase" or the "Firm"), and state as follows:

### JURISDICTION AND VENUE

1.      Plaintiffs' claims arise under 42 U.S.C. § 1981 for race discrimination, and this Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has supplemental jurisdiction over Plaintiffs' state-law and city-law race and gender discrimination and equal pay claims pursuant to 28 U.S.C. § 1367.

2.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §1391(b) because a "substantial part of the events or omissions giving rise to the claim occurred" in this District and Defendant is headquartered in this District. Chase is also licensed to do business and maintains several bank branches in this District and services customers who reside in this District.

## PARTIES

3.      Plaintiff, Laura Agard ("Agard"), started with Chase in 2007 as a Banker and was constructively discharged in 2021. She is Black and worked for Chase in New York. She was a resident of New York until the end of 2021 and is currently a resident of New Jersey.[1]

4.      Plaintiff, Roshanna Richardson ("Richardson"), started with Chase in 2005 as a part-time bank teller and was constructively discharged in 2021. She is Black and worked for Chase in New York. She was a resident of New York until the end of 2021 and is currently a resident of New Jersey.

5.      Agard and Richardson started their careers at Chase in New York City as Bankers nearly two decades ago. They quickly gained financial aptitude and sought to advance their careers at Chase. Both Agard and Richardson sought and achieved the role of Financial Advisor ("FA") due to their banking acumen.

6.      Chase is one of the largest and wealthiest financial institutions in the world. In 2024, Chase earned record revenues in excess of $177 billion dollars. Its market capitalization is well over $500 billion, and it holds assets with a combined value of $4 trillion.[23] Chase currently operates nearly 5,000 bank branches in every one of the lower 48 states.

## FACTUAL ALLEGATIONS

I.      **Chase Has a Long History of Discriminating Against Its Female and Black Employees**

7.      Chase has a long history of systematically discriminating against its female employees.

---

[1] The parties entered into a standstill and tolling agreement effective from November 12, 2024 through December 3, 2025.
[2] Emily Flitter, *Where $30 Billion to Fix Systemic Racism Actually Goes*, The New York Times (Oct. 21, 2022), *available at* https://www.nytimes.com/2022/10/21/business/jp-morgan-racial-equity-pledge.html
[3] JP Morgan Chase & Co Form 10-K for fiscal year ending December 31, 2024, *available at* https://jpmorganchaseco.gcs-web.com/static-files/3aebe5f5-2964-42cb-980b-8f9b86533663

8.     In 2014, the federal Equal Employment Opportunity Commission ("EEOC") charged Chase with discriminating against women. Chase paid $1.45 million to settle the class lawsuit alleging that women in a Chase facility in Ohio were subjected to a sexually hostile work environment and that women who did not accept this treatment were denied training opportunities and lucrative sales calls.[4]

9.     Similarly, in 2020, Chase was targeted by the Department of Labor for discriminating against women. Chase entered into an agreement for $9.8 million to settle claims that it paid to 93 women in its Bank, Technology & Market Strategies Unit less than it paid to comparable men in the similar positions.[5]

10.     Chase also has a lengthy record of racially discriminating against its Black employees.

11.     Chase's racial bias is exemplified by its racial steering, racial redlining, and other discriminatory practices against customers and employees of color.

12.     Chase employs policies and practices that harm African Americans and deny them equal opportunities to earn income and advance at Chase. Pursuant to these policies and practices, Chase systemically denies African Americans business opportunities, resources, support, and advancement opportunities, resulting in lower compensation and higher rates of attrition.

13.     The impact of Chase's discrimination is particularly acute for a role that is supposed to be one of the highest earning—the FA position.

---

[4] EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, JPMorgan Chase Will Pay $1,450,000 to Resolve EEOC Class Sex Discrimination Lawsuit (Feb. 3, 2014), *available at* https://www.eeoc.gov/newsroom/jpmorgan-chase-will-pay-1450000-resolve-eeoc-class-sex-discrimination-lawsuit
[5] JPMorgan Chase & Co., 2022 Environmental Social Governance Report, Diversity, Equity & Inclusion and Human Capital, *available at* https://www.dol.gov/newsroom/releases/ofccp/ofccp20201112

14.     As at many financial institutions, the FA role at Chase has a low salary, close to minimum wage. The majority of an FA's compensation is derived from commission-based payments earned from transactions performed for the benefit of clients. These payments are not necessarily based on skill but rather on the wealth of an FA's customer base, also called the FA's "book of business." The production-based compensation system rewards FAs whom Chase allows to work in affluent areas and punishes those whom Chase assigns to less affluent areas with a customer base with smaller, more low-risk investments such as fixed annuities.

15.     Chase studies and ranks its bank branches and territories according to various metrics and demographic data, including client and community wealth, asset base, and other measures of financial opportunity. Bank branches with a higher ranking are more likely to have one or more licensed Bankers assigned to them, and these Bankers are strong referral sources for FAs at those branches.

16.     As a result of racial stereotypes, race matching, and racial redlining, Chase disproportionately assigns African American FAs to lower-ranked, less lucrative branches and territories that it often marks as low and moderate income ("LMI"), with fewer investable assets and less wealthy clients and potential clients. Because Chase places lower value on these less affluent communities, it subjects them to higher internal risk review, making investments in those communities more difficult than for clients in more affluent communities.

17.     Chase also distributes resources such as training, administrative support, and protections for books of business, among other things, based on the wealth of the FA's client base so that FAs with access to an affluent client base are continuously advantaged over those without access to affluent clients.

18.     In 2018, a class of African American FAs challenged Chase's systemic, widespread discrimination against them in the *Senegal v. Chase* class action in the Northern District of Illinois. *See* Dkt. 6-1, *Senegal v. Chase*, 18-cv-06006 (N.D. Ill. Aug. 31. 2018).

19.     The *Senegal* Plaintiffs challenged several firm-wide policies and practices that caused disparities between Chase's white and African American FAs. Among other things, the *Senegal* Plaintiffs challenged: (a) Chase's disproportionate refusal to provide to its African American FAs the lucrative "Chase Private Client" designation (which allows FAs to service clients with more than $250,000 in investable assets) at the same rate as equally qualified non-African American advisors; (b) Chase's practice of assigning African American FAs to disproportionately African American and low-income bank branches, with substantially less income-generating investment potential; and (c) excluding them from teaming with Chase Private Client ("CPC") bankers. The discriminatory practices challenged in *Senegal* led to a substantial pay disparity between white and African American FAs.

20.     Chase and the *Senegal* Plaintiffs entered into a settlement agreement which received court approval. The settlement agreement included wide-ranging programmatic relief, designed to uproot the discrimination faced by Black FAs at Chase. Among other things, the settlement agreement required Chase to: (a) engage in a systematic review of its branch assignment practices; (b) assemble a high-level committee that would meet regularly "with the objective of increasing the number of [] Black Advisors and increasing [] Black Advisor productivity and retention"; (c) implement coaching and career training for Black advisors; (d) invest in recruitment aimed at hiring Black advisors; and (e) implement programs designed to increase Black representation in management.

21.    As part of the *Senegal* settlement, Chase agreed to pay $24 million to be distributed to Black FAs.

22.    Recently, JP Morgan Chase Bank N.A. was also fined by the State of California's Civil Rights Department for failing to file required pay data reports on the gender and ethnic and racial breakdowns of its employees for its 900 bank branches in California.[6] These reporting requirements were enacted to help the State detect pay discrimination, and Chase attempted to evade these requirements until the California Civil Rights Department filed a suit to force its compliance.

23.    In 2020, following the murder of George Floyd by a Minneapolis police officer and the ensuing national racial reckoning, Chase, like many other companies, announced a commitment to racial equity. Aimed at burnishing its image as a racially progressive company that supports civil rights, Chase engaged in a PR-focused charm offensive. Chase's CEO Jamie Dimon even "took a knee" in support of racial justice protesters. Dimon also admitted that the Firm's effort to attract, retain, and promote Black employees "simply is not good enough."[7]

24.    However, now that performative virtue-signaling regarding racial equity is no longer in vogue, Chase has stepped back from even its faux commitment to diversity. Dimon has recently explained that to Chase, equity means "equal treatment, equal opportunity, and equal access . . . not equal outcomes."[8]

---

[6] *California Civil Rights Department Settles with JPMorgan Chase Bank N.A., Michaels Stores Over Failure to File Pay Data Reports*, STATE OF CALIFORNIA, CIVIL RIGHTS DEPARTMENT (Sept. 2, 2022), https://calcivilrights.ca.gov/2022/09/02/california-civil-rights-department-settles-with-jpmorgan-chase-bank-n-a-michaels-stores-over-failure-to-file-pay-data-reports/.

[7] Leah Fessler, *JPMorgan's CEO admits his company has a black talent problem—and the finance industry should listen*, QUARTZ MEDIA (Apr. 6, 2017), https://qz.com/951064/jpmorgan-chases-ceo-jamie-dimon-admits-to-diversity-problems-with-black-talent-in-his-2017-letter-to-shareholders.

[8] Charles Gasparino, *Jamie Dimon may not see it, but JPMorgan has a glaring 'woke' blind spot*, NEW YORK POST (Sept. 14, 2024), https://nypost.com/2024/09/14/business/jamie-dimon-may-not-show-it-but-jpmorgan-has-gone-woke/.

25.     Similarly, once the terms of the *Senegal* settlement expired, Chase also reduced even the appearance of any genuine efforts to increase diversity among its employees.

26.     Recently, Chase's CEO has been more candid in admitting that the Firm's commitment to its DEI practices was merely performative when a taped conversation was leaked to the press in which Dimon derided the Firm's DEI efforts: "I saw how we were spending money on some of this stupid sh-t, and it really pissed me off. . . I'm just gonna cancel them. I don't like wasted money in bureaucracy."[9]

## II.    Chase Discriminated Against Agard Based on Her Race and Gender

27.     In September 2007, Agard started her career at Chase as a Banker. Consistent with the *Senegal* allegations, when Agard applied, Chase steered her to the neighborhood of Brooklyn, Bedford-Stuyvesant which it considered to be less affluent than other areas to which she could have been assigned.

28.     In 2012, after several successful years as a Banker, Agard decided to advance her career by becoming an FA. To do so, she left her $40,000 salary as a Banker for a $28,000 salary as an FA—accepting Chase's representations that the commissions she would earn as an FA would make up for that salary gap and, over time, lead to substantially higher earnings as she built a book of business.

29.      Agard trained to be an FA in the affluent area of downtown Brooklyn called Cobble Hill.

---

[9]Amanda Gerut, "JPMorgan CEO Jamie Dimon wants to cancel some DEI spending after the bank spent billions on racial equity: 'I was never a firm believer in bias training,'" FORTUNE (Feb. 14, 2025), a*vailable at* https://fortune.com/2025/02/14/jpmorgan-ceo-jamie-dimon-dei-bias-training-spending-racial-equity/

30.     However, after Agard trained in Cobble Hill, Chase assigned her back to the less affluent neighborhood of Bedford-Stuyvesant, consistent with its firm-wide practice of steering Black FAs to less affluent or LMI areas compared to their non-Black counterparts.

31.     Because Chase considered Bedford-Stuyvesant a less affluent community, it assigned the principal review desk to conduct internal risk management reviews on all of Agard's accounts, making building a book of business slower and more complicated than it was for white FAs not racially steered by Chase to less affluent communities who did not need to have the principle review desk clear their accounts before they could manage the assets.

32.     Nevertheless, with hard work and determination, Agard built a substantial book of business in Bedford-Stuyvesant. Because Chase limited her to an LMI community, she pulled much of this book of business together from low-risk investments like annuities that required her to do more work to manage the account for lower reward (commission payout) under Chase's commission plan.

33.     After working hard for years to build her book, Agard prepared to go on maternity leave in February 2017. This preparation included working up until she went into labor to open a $1 million client account. Despite her best efforts, she was unable to put on the final touches prior to her leave. Instead of giving her credit for her work or permitting her to finalize the opening while on leave—which she was willing and offered to do—Chase gave another FA 100% of the credit/commission even though Agard had done 99% of the work.  Chase did not undermine male FAs who needed to take time off of work to address medical or other issues in this manner.

34.     This treatment was consistent with Chase's treatment of women who took maternity leave, including Agard and Richardson, more generally. Although white men took

Family Medical Leave Act ("FMLA") leave with no impact on their book of business, Chase routinely permitted male FAs to poach women's books of business while they were on maternity leave or allow them to otherwise take away leads, referrals, and other business these women were pursuing at the time they took maternity leave. This practice was built on the stereotyped assumption that women taking maternity leave—as opposed to men taking medical or other leaves—were likely not to return to the work force after having children or were more likely to prioritize their children over their work. Thus, managers allowed male FAs to steal women FA's business while they were gone with impunity while protecting the white men's books of business while they were out of the office to ensure assets and account were preserved in their absence.

35.     In fact, even among financial firms, Chase was slow to adopt policies to protect the books of business of women on maternity leave. Many firms implemented strong disability related leave of absence policies, including for pregnancy, in the late 1990s. In contrast, Chase did not have a policy for protecting the books of female FAs who went on maternity leave until recently. While men were able to take FMLA absences without having their books of business cannibalized by FAs, women like Agard and Richardson, who attempted to build their families while continuing to work and build a career returned from maternity leave to greatly reduced or non-existent books of business.

36.     Because of her fear that her business would be stolen by her male colleagues, Agard felt compelled to work up until she went into labor to ensure she would benefit from her book for as long as possible. Despite her hard work, she could not prevent her book from being decimated by her male colleagues after she left with Chase's knowledge and consent.

37.     Unlike its practice for the white male FAs, Chase did not allow Agard any input into which FA managed her book of business while she was on leave. And Chase allowed Agard's clients to be steered toward and poached by other FAs.

38.     Indeed, when Agard's clients came into the branch during her leave, they were directed toward other FAs who took the entirety of the clients' accounts or opened up additional accounts for Agard's clients without her knowledge and then transferred the clients' assets into these newly opened accounts. When Agard returned, she had to rebuild her book of business from the scraps other FAs left her. This was devastating to Agard and significantly impacted her compensation under Chase's compensation system, which is tied to total assets under management and fees and commissions earned based on the management and investment of her clients' account assets.

39.     Despite Chase permitting other FAs to decimate her book of business and leaving her to begin again mostly with low-risk, low-commission accounts, Agard worked hard to rebuild her book to over $40 million in assets before taking her second maternity leave as an FA in October 2019.

40.     Again, unlike white male advisors who took leaves for medical and other purposes, Chase refused to give Agard any input into who took care of her business during her leave. With no way to protect her client accounts, it was once again open season on her book.

41.     As just one example, during this maternity leave, one of Agard's clients came to meet with her at the Branch and was directed to a male, non-Black FA named James Quach ("Quach"). Quach, who had a record of customer complaints, told the client that Agard just had a child and implied that there was no certainty about when or whether she would come back.  To another client, Quach insinuated that Agard may not be able to meet the client's needs because

10

she was a mother. Because of the strong relationships Agard built with her clients, both clients reported these incidents to Agard. Agard in turn escalated these concerns to Human Resources who, to her knowledge, did not address her complaints or take any other action to protect her business.

42.    Chase also allowed other FAs to open new accounts for her clients while she was on leave without her knowledge. Chase had a policy which protected FAs with larger books or business and who generated higher revenue from having other FAs poach their clients. These FAs were designated as CPC FAs and Chase ensured that other FAs could not open new accounts for any of their clients. Because of Chase's discriminatory assignment, account and other policies and practices, most of these CPC FAs were white males. As a Black female FA, Agard did not benefit from these or any other safeguards Chase implemented to protect FAs books of business.

43.    When Agard returned to work after this maternity leave, her book of business had been largely usurped by male FAs and she was unable to get most of the business back. As a result of both Chase racially steering her to an LMI community and its practice of leaving books of business unprotected during maternity leaves, Agard was again left with a small book of business comprised heavily of low-risk, low reward products like annuities, making it difficult for Agard to earn a living.

44.    Chase drastically cut Agard's income again in or around late 2020 when it changed how it compensated FAs on annuities business under the Firm's compensation system. Chase altered its annuities commission structure, reducing commission payments to FAs. This practice disproportionately impacted Black FAs like Agard who were steered to lower income communities in which clients often sought lower risk investments such as annuities with the little

savings they had been able to accumulate. Chase's new compensation plan was designed to incentivize FAs to push their clients into managed accounts, which was not feasible for the types of customers in the branches to which Agard and other Black FAs were steered. Chase's new annuities practice further reduced Agard's income.

45.     In or around August 2021, Agard reported to Human Resources that her manager allowed even some of her annuity business to be reassigned to another FA. Chase took no action and instead engaged in further acts of discrimination and retaliation, including by forcing her to accept a demotion, as described below.

46.     Completely demoralized and with drastically lower income than she expected as an FA, Agard had no choice but to accept a new position at Chase in a remote FA role in or around the fall of 2021. The overall compensation was significantly lower than what she had earned before she took maternity leave and was a demotion when considering the total earning potential of each role.

47.     Realizing she would be unable to earn a living sufficient to support her family or rebuild her career as a result of the impact of Chase's discriminatory policies and practices and the demotion to a remote FA, Agard had no choice but to leave Chase. Agard was constructively discharged in or around November 2021.

48.     As a result of Chase's unlawful conduct, Agard lost substantial income, suffered emotional distress, and her career and reputation were irreparably harmed, among other losses. Chase's unlawful conduct was intentional and in blatant disregard of her legal and civil rights and warrants imposition of liquidated and punitive damages.

**III.    Chase Discriminated Against Richardson Based on Her Race and Gender**

49.     Richardson started at Chase in 2005 as a part-time teller in Chase's Foster Avenue branch in the primarily Black neighborhood of Canarsie in Brooklyn, New York.

50.    Shortly after Richardson began, her managers recognized her potential. One of her Black female managers was being groomed for assignment to the Utica and Eastern Parkway Chase Branch in a primarily Black, working-class neighborhood of Crown Heights, and took Richardson with her to work as a Personal Banker.

51.    In or around November 2011, Richardson applied to become an FA, at a time where the majority of Chase FAs were white males. Chase informed Richardson that it wanted to hire more female FAs because Chase believed that female FAs would be less aggressive than male FAs and may be able to tap into a different market of customers with this approach.

52.    Chase determined that another FA was needed at the Coney Island and Brighton Beach Avenue Branch, which served a primarily white though still LMI clientele and had only one FA. Chase placed Richardson in this FA role to begin her career in wealth management.

53.    While this branch could support two FAs, Osher Douek, the white male FA already at the branch, had no intention of sharing the territory. Instead, Douek, with the tacit approval of management, decided that Richardson, because of her race and gender, would only work with clients who held less than $250,000 in combined investable assets or otherwise had low-value accounts with little opportunity for generating revenue, retaining the wealthier investors at the branch exclusively for himself. At the time, the threshold for becoming a private banking client at Chase was working with clients who invested at least $250,000.[10] By preventing Richardson from servicing clients with investments of $250,000 and over or otherwise limiting her to low-value accounts, Chase and Douek intentionally prevented her from

---

[10] Emily Flitter, *This Is What Racism Sounds Like in the Banking Industry,* NEW YORK TIMES, *December 19, 2019 available at* https://www.nytimes.com/2019/12/11/business/jpmorgan-banking-racism.html

working with clients whose accounts would result in higher compensation for Richardson and would have allowed her to obtain the coveted private banking designation.

54.     Because Chase permitted Douek to unfairly and discriminatorily limit Richardson's access to higher net worth clientele, she began her tenure at the branch at an immediate deficit compared to her white male counterparts.

55.     The racial hostility exhibited by Douek was echoed by certain white clients at the branch. For example, a female customer agreed to an appointment with the new FA. However, when she met Richardson in person and observed that she was Black, the client claimed that she could not speak English and, thus, would need to work with Douek.  However, just moments after the client made this comment, Richardson observed her speaking English to another branch employee. Chase and Douek allowed this customer to bring her business to Douek instead on the apparent basis of Richardson's race.

56.     On the occasions where Richardson had success with clients, Douek sought to undermine her. In one example, a client Douek wrote off as falling below his asset threshold decided to conduct a single $400,000 investment (indicating that the total account would be much bigger) with Richardson. Douek was immediately upset that a client whom he had designated as low potential and therefore appropriate for Richardson had suddenly invested a significant amount with her.

57.     Douek fought to take credit for the $400,000 account arguing that because he, unlike Richardson, was the designated CPC FA, the client should automatically be transferred to him. Chase did not permit such blatant attempts at poaching from white male FAs, even when they were not designated CPC FAs.

58.     While Douek was trying to steal this client account away from Richardson, she was getting close to taking maternity leave. She was concerned that Chase would ultimately allow Douek to take this significant account from her given its discriminatory policies and practices toward women with families and Black FAs.

59.     Richardson's fears came true, and then some. Consistent with Chase's pattern and practice of discriminating against women while they were out on maternity leave, Douek stole Richardson's entire book of business while she was out of the office.

60.     Richardson was completely defeated.

61.     After allowing Douek to poach her entire client base, Richardson's white male manager asked Richardson if she intended to continue as an FA when she returned from maternity leave. Although discouraged by Chase's treatment and offended by her manager's question, Richardson had worked too hard to give up, and she informed her manager that she would be returning as an FA.

62.     Her manager said that upon her return he would send her to a location that would be a "better fit" for her, or words to that effect.

63.     When she returned from leave, Richardson was steered back to the primarily Black neighborhood of Canarsie at Avenue K and Ralph to start over without a book of business despite her years as an FA.

64.     As the only FA at that branch, Richardson was able to build business in the area. However, unlike Douek and other white male advisors in white, more affluent neighborhoods, Chase would not designate Richardson as a CPC FA despite the fact that she had proven capable of managing larger accounts. Not only is the CPC designation helpful to an FA in soliciting

business but it opens to door to additional resources and benefits FAs can use to help attract

more and higher net worth clients. These additional tools remained inaccessible to Richardson.

65.     In 2017, while at the Avenue K and Ralph branch, Richardson went on a

maternity leave. Unlike the prior time she took leave, and both of the maternity leaves taken by

Agard as an FA, Richardson was able to ask for a specific male FA to cover her book while she

was out so that, in theory, her book would be protected from the other FAs in the branch. A

Black male advisor was assigned to manage Richardson's book while she was on leave.

66.     The promised protection proved illusory. When Richardson returned from leave,

both she and the Black male advisor took every step possible to make sure that her accounts were

returned to her, but Chase's systems made it very difficult. Indeed, there was no clear way for

that advisor to return Richardson's clients. Even when Richardson's clients specifically

requested that their account be reassigned back to Richardson, the accounts remained under the

Black male advisor's FA number. In fact, some of her accounts, including her annuity business

were improperly transferred to a white male advisor, Larry Patron ("Patron") while she was on

leave. Once again, Richardson's book was decimated while she was on maternity leave,

dramatically impacting her assets under management and production, and consequently, her

income.

67.     This scenario repeated itself when Richardson went out on her third maternity

leave in 2020. Richardson again attempted to have her accounts protected by the Black male

advisor while she was on leave, but there was no way for her to get her accounts back upon her

return. And again Patron improperly took over some of Richardson's accounts during her leave.

And, as with her first two maternity leaves, Richardson returned from leave only to find her book

decimated, negatively impacting her income in a way that would never occur to a male FA.

68.    Not long after Richardson returned from leave, Chase closed the branch at Avenue K and Ralph[11] and sent Richardson to work at the Avenue N and Ralph branch, located in the predominantly white and more affluent neighborhood of Mill Basin. Not only did Richardson lose business because some of her clients were uncomfortable moving their accounts to a branch in a predominantly white neighborhood, but she also faced continued race and sex discrimination while at the new branch.

69.    Richardson once again was forced to play second fiddle to a well-established white male FA—this time Patron, to whom Chase had already improperly transferred some of her accounts. Adding insult to injury, when clients did follow Richardson to the Avenue N branch, Patron attempted to poach those clients, especially if they had higher incomes.

70.    Chase awarded Patron resources it denied Richardson. For example, as it had with Douek, Chase granted Patron the CPC FA designation and assigned him a CPC Banker, but it did not assign Richardson a CPC Banker. (As a result of the programmatic relief of the *Senegal* lawsuit, Richardson was at one point designated a CPC FA, but it was an in-name-only designation and did not come with the benefits of being a true CPC FA.) Further, Chase gave Patron his own office but not Richardson. Therefore, even though Chase allowed Richardson to work at a more affluent branch, it still ensured she was treated as a second-class FA and paid at a lower rate due to her race and gender.

---

[11] Chase has disproportionately closed bank branches in majority-African American neighborhoods compared to branches in non-African American neighborhoods, regardless of the neighborhoods' income levels. *See* Zach Fox et. al., *Bank branch closures take greatest toll on majority-black areas*, S&P GLOBAL (July 25, 2019), *available at* https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/bank-branch-closures-take-greatest-toll-on-majority-black-areas-52872925; *see also Brown, Menendez Lead Letter Asking JPMorgan Chase To Remember Its Own History When Responding To "Abhorrent" Racial Discrimination*, US SENATE COMMITTEE ON BANKING, HOUSING, AND URBAN AFFAIRS (Dec. 20, 2019), *available at* https://www.banking.senate.gov/newsroom/minority/brown-menendez-lead-letter-asking-jpmorgan-chase-to-remember-its-own-history-when-responding-to-abhorrent-racial-discrimination;

71.    Further, Richardson struggled to gain new clients because the two white male Private Bankers at the branch directed all new potential clients to Patron and away from Richardson due to her race and gender. When new clients came in and asked to meet with the FA, the Bankers would either direct them to Patron or offer to make an appointment for them to meet with Patron if he was not available, even though Richardson was assigned to the bank and often present in the office. At one point, when a Banker sent a new client out of the bank with an appointment to meet Patron in the future, even though Richardson was sitting feet away at the branch, Richardson registered a complaint of race and sex discrimination with her supervisor, John Wagner.

72.    Wagner knew that the steering of new clients away from Richardson was a massive roadblock impacting her ability to develop a book of business. Nonetheless, Wagner and Chase did not correct the practice of steering all business to Patron or take any other action to compensate Richardson for the lost business revenue and instead allowed the discrimination to continue, in a further act of race and sex discrimination and in retaliation for Richardson's protected activity. Because of Chase's failure to eradicate this and other racist and sexist behavior and as a result of Chase's retaliation against Richardson for engaging in protected activity, Richardson was unable to generate sufficient revenue and income. Thus, Richardson, like Agard, was forced to take a demotion to a remote FA position, significantly reducing her earning potential and essentially ending her career as a traditional FA at Chase.

73.    In or around December 2021, Richardson had no choice but to leave Chase because she was unable to earn enough income as a remote FA position to support her family.

74.    As a result of Chase's unlawful conduct, Richardson lost substantial income, suffered emotional distress, and her career and reputation were irreparably harmed, among other

losses. Chase's unlawful conduct was intentional and in blatant disregard of her legal and civil rights and warrants imposition of liquidated and punitive damages.

## COUNT I
## RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981

75.     Plaintiffs repeat and reallege each and every paragraph above and incorporate them by reference as though fully stated herein.

76.     Section 1977 of the Revised Statutes, 42 U.S.C. § 1981, as amended, guarantees persons of all races the same right to make and enforce contracts, regardless of race. The term "make and enforce" contracts includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, and conditions of the contractual relationship.

77.     By the acts and conduct described above, Chase engaged in illegal intentional racial discrimination against Agard and Richardson in violation of 42 U.S.C. § 1981.

78.     Through conduct alleged herein, Chase denied Plaintiffs opportunities and benefits available to similarly situated white employees.

79.     Agard and Richardson were subjected to and harmed by Chase's systemic and individual discrimination.

## COUNT II
## RETALIATION IN VIOLATION OF 42 U.S.C. § 1981

80.      Plaintiffs repeat and reallege each and every paragraph above and incorporate them by reference as though fully stated herein.

81.     Section 1981 makes it unlawful for an employer to retaliate against an employee because that employee engaged in protected activity, such as challenging, reporting, and complaining to his employer about race discrimination.

82.    Plaintiffs engaged in protected activity by challenging, reporting, and complaining about race discrimination to Chase.

83.    Chase took adverse employment actions against Plaintiffs as further discrimination and in retaliation for engaging in this protected activity.

84.    Plaintiffs were subjected to and harmed by Chase's further discrimination and retaliation after complaining about Chase's racially discriminatory conduct.

85.    As a direct and proximate result of Chase's conduct, Plaintiffs have suffered damages.

## COUNT III
## PAY DISCRIMINATION IN VIOLATION OF THE
## NEW YORK ACHIEVE PAY EQUITY ACT

86.    Plaintiffs repeat and reallege each and every paragraph above and incorporate them by reference as though fully stated herein.

87.    New York's equal pay law mandates equal pay among employees in the same establishment who perform at least "substantially similar" work, when considering skill, effort, responsibility, and working conditions.

88.    As set forth above, Chase paid Agard and Richardson at wages less than the wages paid to white male FAs for substantially similar work.

89.    As a direct, foreseeable, and proximate result of Chase's conduct, Plaintiffs incurred damages in an amount to be proven at trial.

90.    The actions alleged herein were done willfully by intentionally, knowingly, and deliberately paying Black and female employees less than similarly situated white men.

91.    Plaintiffs suffered harm as a result of Chase's violation of the New York Achieve Pay Equity Act.

<u>COUNT IV</u>
## DISCRIMINATION UNDER THE NYSHRL

92.     Plaintiffs repeat and reallege each and every paragraph above and incorporate them by reference as though fully stated herein.

93.     Chase maintains a substantial presence in New York, employing over 24,000 people in New York City alone including Agard and Richardson.

94.     New York State Executive Law § 296, 1) provides: "It shall be an unlawful discriminatory practice: (a) For an employer… because of an individual's race, creed, color, national origin[,…or] sex… to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment; (h) For an employer… to subject any individual to harassment because of an individual's…. race, creed, color, national origin[,…]sex[,…]or because the individual has opposed any practices forbidden under this article or because the individual has filed a complaint, testified or assisted in any proceeding under this article, regardless of whether such harassment would be considered severe or pervasive under precedent applied to harassment claims. Such harassment is an unlawful discriminatory practice when it subjects an individual to inferior terms, conditions or privileges of employment because of the individual's membership in one or more of these protected categories…. Nothing in this section shall imply that an employee must demonstrate the existence of an individual to whom the employee's treatment must be compared."

95.     Chase engaged in unlawful discriminatory practices by paying Plaintiffs less because of their race (Black) and sex (female), allowing their books of business to be cannibalized because of their sex, demoting and constructively discharging them because of their

race and sex, allowing a hostile work environment to persist, and failing to address Plaintiffs' complaints of race and sex discrimination.

96.    Chase maintained racially discriminatory employment practices and policies, including but not limited to hiring, pay, job assignment, promotion, and other practices that had a disparate impact on Black and female employees who worked for Chase in New York.

97.    Plaintiffs suffered damages as a result of Chase's violation of the NYSHRL.

## COUNT V
## RETALIATION UNDER THE NYSHRL

98.    Plaintiffs repeat and reallege each and every paragraph above and incorporate them by reference as though fully stated herein.

99.    Chase maintains a substantial presence in New York, employing over 24,000 people in New York City alone.

100.    New York State Executive Law § 296 makes it unlawful for an employer to retaliate or discriminate against any person for filing a complaint or engaging in other protected activity.

101.    Chase retaliated against Plaintiffs by impeding their career trajectories, reducing their compensation, and demoting and constructively discharging them based on their race and sex.

102.    Chase would not have retaliated against Plaintiffs but for Plaintiffs' complaints about the pay disparity, discrimination, and hostile work environment.

## COUNT VI
## RACE DISCRIMINATION AND HOSTILE WORK ENVIRONMENT
## IN VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW

103.    Plaintiffs repeat and reallege each and every paragraph above and incorporate them by reference as though fully stated herein.

104.    Chase maintains a substantial presence in New York City, employing over 24,000 people.

105.    The NYCHRL, NYC Admin Code § 8-101, *et seq.*, establishes that it is unlawful, because of an individual's race, "to bar or to discharge from employment such person," or to "discriminate against such person in compensation or in terms, conditions or privileges of employment." NYC Admin Code § 8-107.

106.    Chase maintained racially discriminatory employment practices and policies, including but not limited to pay, job assignment, and other practices that had a disparate impact on Black and female employees who worked for Chase in New York City.

107.    By its conduct as alleged herein, Chase unlawfully discriminated against Agard and Richardson in violation of NYCHRL, under both disparate treatment and disparate impact theories of liability.

## COUNT VII
### RETALIATION
### IN VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW

108.    Plaintiffs Agard and Richardson reallege each and every paragraph above and incorporate them by reference as though fully stated herein.

109.    Chase maintains a substantial presence in New York City, employing over 24,000 people including Agard and Richardson.

110.    Plaintiffs Agard and Richardson suffered damages as a result of Chase's violation of the NYCHRL.

111.    The New York City Administrative Code §8-107(7) provides that it shall be unlawful discriminatory practice: "For an employer . . . to discriminate against any person because such person has opposed any practices forbidden under this chapter…"

112.    Chase engaged in an unlawful discriminatory practice by retaliating against Plaintiffs because of her opposition to the unlawful employment practices of Chase.

**<ins>PRAYER FOR RELIEF</ins>**

**WHEREFORE**, Plaintiffs respectfully requests that this Court enter a judgment in their favor and against Chase as follows:

a).  Declare that Chase's acts, conduct, policies and practices are unlawful and violate 42 U.S.C. § 1981, NYSHRL, NYCHRL, and New York Achieve Pay Equity Act;

b).  Enjoin Chase from further unlawful race and gender discrimination against Plaintiffs, and order all appropriate relief;

c).  Order Plaintiffs reinstated to their appropriate positions, and otherwise make Plaintiffs whole;

d).   Award Plaintiffs the value of all compensation and benefits lost and that they will lose in the future as a result of Chase's unlawful conduct;

e).  Reinstate Plaintiffs to their former positions;

f).  Award Plaintiffs damages for non-monetary harm they have suffered, including but not limited to emotional distress;

g).  Award Plaintiffs compensatory, punitive, and liquidated damages;

h).  Award Plaintiffs prejudgment interest, costs, and disbursements, as provided by law;

i).  Award Plaintiffs reasonable attorney's fees and costs of litigation; and

j).  Award Plaintiffs such other relief as this Court deems just and proper.

Dated: December 16, 2025                     Respectfully submitted,


                                             STOWELL & FRIEDMAN, LTD.

                                             By:____/s/ Shona B. Glink____

                                             Shona B. Glink
                                             Linda D. Friedman
                                             STOWELL & FRIEDMAN LTD.
                                             303 W. Madison St., Suite 2600
                                             Chicago, Illinois 60606
                                             Phone: (312) 431-0888
                                             sglink@sfltd.com
                                             lfriedman@sfltd.com